AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

## UNITED STATES DISTRICT COURT

for the

Southern District of California

OCT – **3** 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Samsung SM-T116BU<br>IMEI: 359133/06/188693/9; S/N: RQ2H800E9ZY<br>Seized from Syloina MOISE on September 30, 2019 | )<br>)<br>)<br>)<br>)<br>)  Case No. **1 9 M J 4 2 9 9** |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(i) & (v)(I);<br>8 USC 371; 18 USC 1001(a)(2);<br>18 USC 1001(a)(3); 18 USC 1 | Conspiracy to Bring Certain Aliens Without Presentation; Conspiracy to Use False<br>Documents; 1False Statements; False Documents; and Aiding and Abetting as to<br>the Falsification of Records or Documents in a Federal Investigation |

The application is based on these facts:

See attached affidavit of Mauricio Duran, HSI Special Agent

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mauricio Duran, HSI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/3/19__

*Judge's signature*

City and state:   San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Mauricio Duran, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

**INTRODUCTION**

1.    This affidavit supports applications for warrants to search the following cellular phone and tablet:

> **CELLULAR PHONE**
> Samsung SM-J737T
> IMEI: 359797094028766
> Seized from Alize MOISE on October 2, 2019
> (**Target Device 1**);
>
> **TABLET**
> Samsung SM-T116BU
> IMEI: 359133/06/188693/9
> S/N: RQ2H800E9ZY
> Seized from Syloina MOISE on September 30, 2019
> (**Target Device 2**);

collectively referred to herein as the **Target Devices**, as described in Attachments A-1 through A-2 (incorporated herein by reference), and seize evidence of crimes and property used in the commission of crimes, specifically, violations of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I) – Conspiracy to Bring Certain Aliens Without Presentation; 8 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. § 1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C. §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a Federal Investigation, as further described in Attachment B.

2.    The requested warrants relate to the investigation and prosecution of Syloina MOISE ("S. MOISE") and Alize MOISE ("MOISE"), all of whom entered the United States from Mexico illegally on September 30 and October 2, 2019, respectively. As to S. MOISE, she claimed a false familial relationship to avoid further detention by immigration

1    authorities.  *See United States v. Slyoina Moise*, 19MJ4250-MSB. The **Target Devices** are
2    currently in the possession of the Department of Homeland Security and are presently
3    stored at 2297 Niels Bohr Court, San Diego, CA 92154.  The **Target Devices** are currently
4    in the possession of the Department of Homeland Security and are presently stored at 2297
5    Niels Bohr Court, San Diego, CA 92154.

6         3.     The information contained in this affidavit is based upon my experience and
7    training, consultation with other federal, state, and local law enforcement agents.  The
8    evidence and information contained herein was developed from interviews and my review
9    of documents and evidence related to this case.  Because this affidavit is made for the
10   limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain
11   all of the information known by me or other federal agents regarding this investigation,
12   but only contains those facts believed to be necessary to establish probable cause.  Dates,
13   times, and amounts are approximate.

14                           **EXPERIENCE AND TRAINING**

15        4.     I am a Special Agent (SA) with ICE, HSI, and have been so employed since
16   August 2017.  I currently am assigned to the Document and Benefit Fraud Task Force,
17   where my duties include investigating fraudulent applications for immigration benefits, the
18   manufacture and sale of fraudulent immigration documents, and financial exploitation of
19   immigrants.

20        5.     I am a graduate of the Federal Criminal Investigator Training Program (CITP)
21   and the Homeland Security Investigations Special Agent Training (HSISAT) academies at
22   the Federal Law Enforcement Training Center in Brunswick, Georgia.  I am also a graduate
23   of the Border Patrol Agent Training academy at the Federal Law Enforcement Training
24   Center, Artesia, New Mexico.

25        6.     As a Special Agent, my primary duties include the investigation of criminal
26   immigration-related violations under Title 8 of the United States Code and identity fraud-
27   related investigations under Title 18 of the United States Code.  I have spoken with other
28   agents with extensive experience in human smuggling and identity fraud-related

2

1    investigations. I have arrested or participated in the arrest of persons for violations under
2    Titles 8 and 18 of the United States Code. I have conducted interviews with arrested
3    persons and their associates, as well as cooperating individuals and informants. I have
4    conducted surveillance of individuals involved in human smuggling and illegal re-entries,
5    and individuals suspected of identity fraud while operating inside the United States.
6    Through these investigative activities, I have gained a working knowledge and insight into
7    the typical activity of individuals attempting to circumvent the United States' immigration
8    laws by avoiding apprehension or maintaining a presence in the United States without
9    detection.

10        7.      Since August 2018, I have been involved in the investigations of fraud and
11   smuggling related apprehensions near the international border between the United States
12   and Mexico. My current assignment is part of what is known as the Southwest Border
13   Surge Initiative. My duties include taking sworn statements from defendants, other
14   individuals without legal status apprehended as part of a group near the border, and children
15   where possible; preparing reports for criminal and administrative cases; collecting
16   evidence; seizing personal property; and creating intelligence reports.

17        8.      Generally, and subject to certain exceptions, when an adult without legal
18   status is apprehended for an illegal entry but has her or his minor child present, this adult
19   may be released from immigration custody or not subject to criminal prosecution in order
20   to avoid separation from the child. Subject to certain exceptions, when an unaccompanied
21   minor (i.e., a minor without legal status and who is not with a parent or guardian) is
22   apprehended for an illegal entry, that unaccompanied minor eventually is released from
23   immigration custody or not subject to criminal prosecution. During my current assignment
24   as part of the Southwest Border Surge Initiative, I have been tasked with investigating
25   whether individuals without legal status are making fraudulent claims about: (1) their status
26   as a parent to a purported minor child who is with them; or, (2) their status as a minor.
27   These claims are made in order to avoid extended detention at immigration facilities or
28   criminal prosecution. During interviews, individuals who admit to the false claims explain

3

1  how human smugglers or other individuals without legal status told them to make these
2  false claims in order to gain entry into the United States.

3       9.    Through the course of my training, investigations, and conversations with
4  other law enforcement personnel, defendants, and smuggled humans, I am aware that it is
5  a common practice for: (a) human smugglers to work in concert with other individuals and
6  to do so by utilizing cellular telephones, and portable radios to maintain communications
7  with co-conspirators in order to further their criminal activities; (b) the smuggled aliens to
8  communicate with the human smugglers or a go-between by utilizing cellular telephones
9  in order to further their illegal entry into the United States; (c) the smuggled aliens will
10  have information stored on their cellular telephones that show their true identity including
11  name, nicknames, date of birth, home, school or work addresses and descriptions, familial
12  associations; and (d) smuggled aliens, if relying on false statements or documents about
13  being in a parent-minor child relationship or being an unaccompanied minor in an attempt
14  to gain entry into the United States and/or to avoid further detention or criminal
15  prosecution, will have information stored on their cellular telephones that show the
16  gathering of information to support these false statements or documents.  Conspiracies
17  involved in the smuggling and trafficking of undocumented aliens generate many types of
18  evidence including, but not limited to, cellular phone-related evidence such as voicemail
19  messages referring to the method and manner of the smuggling venture, arrangements of
20  travel and payment, names, photographs, text messaging (via SMS or other applications),
21  and phone numbers of co-conspirators.  I also know that human smugglers often use
22  fraudulent information to subscribe to communication facilities, especially cellular
23  telephones, and frequently change communications facilities to thwart law enforcement
24  efforts to intercept their communications.

25      10.    In preparing this affidavit, I have conferred with other agents and law
26  enforcement personnel who are experienced in the area of human smuggling
27  investigations, and the opinions stated below are shared by them.  Further, I have personal
28  knowledge of the following facts, or have had them related to me by persons mentioned in

1   this affidavit.

2            a.      Human smugglers and smuggled aliens use "digital devices," including
3   cellular telephones and smart electronic devices with messaging applications because these
4   devices are mobile.  In addition, these devices allow smugglers and smuggled aliens to
5   have instant access to telephone calls, instant messaging, text messaging, social media
6   applications, and voice messaging.

7            b.      Human smugglers and smuggled aliens use their cellular telephones
8   and smart electronic devices to communicate amongst each other to coordinate the logistics
9   and payments related to the smuggling of the undocumented aliens into the United States
10  and from thereon.  Regarding the logistics, the smuggling method may include obtaining,
11  making, altering, or using what appear to be official birth records from a foreign country
12  to show a parent-minor child relationship between smuggled aliens or that a smuggled alien
13  is an unaccompanied minor in order to avoid further detention or criminal prosecution after
14  apprehension by immigration authorities such as Border Patrol Agents.

15           c.      An undocumented alien or someone closely associated with this
16  undocumented alien may make contact using their cellular phones or smart electronic
17  devices with an initial human smuggler while the undocumented alien is outside of the
18  United States.  They will discuss over the phone or via a messaging application about the
19  logistics as to how to smuggle this undocumented alien into the United States (such as
20  using false documents) and the financial payments involved with the smuggling act.  Using
21  the phone or a messaging application on the phone, this smuggler will work with other
22  associates to coordinate how to smuggle this undocumented alien along with the financial
23  payments.  Using the phone itself or a messaging application on their phone, the smuggler
24  or associates will advise the undocumented alien or the close contact to the undocumented
25  alien about the next steps including the meet-up point.  Using the phone or messaging
26  application, they may discuss the method, manner and payment at that time or after
27  successfully smuggling the undocumented alien into the United States.

28

1            d.      The undocumented aliens also will use their phones to make calls or

2    send text messages to discuss the smuggling arrangements with the smugglers themselves,

3    or a go-between such as a family member or close friend prior to and during the smuggling

4    event.  On making their illegal entry into the United States, the smuggled aliens may use

5    their phones to continue to communicate with the smugglers or the go-between such as a

6    family member or close friend to discuss the manner and method of the smuggling activity

7    including the payment.

8            e.      Subscriber Identity Module (SIM) cards also known as subscriber

9    identity modules are smart cards that store data for certain cellular telephone

10   subscribers.  Such data includes user identity, phone number, network authorization data,

11   personal security keys, contact lists, and stored text messages.  Dependent on the cellular

12   device, information on a SIM cards can be collected as evidence as to the operator use of

13   that particular cellular telephone.  SIM cards may be transferrable between different

14   cellular/mobile telephones.  Human smugglers and their co-conspirators sometimes will

15   replace the SIM (memory) cards in their cellular or mobile phones as a means to avoid

16   detection.

17           f.      Undocumented aliens are like anyone else who has friends and family.

18   They will use social media accounts such as Facebook to update family and friends to

19   discuss their whereabouts, daily activities or travels as they make their way to the United

20   States.  They may use messaging applications such as Facebook Messenger to do the same

21   or the coordinate with the human smugglers.  The undocumented aliens may share

22   photographs of themselves or where they are located.  In order to register their accounts,

23   they will input a name, e-mail address and date of birth and decide how much information

24   to keep public or private from the general public.  At the time of their apprehensions,

25   undocumented aliens who use false documents or make false claims about their identity or

26   family relationships to immigration authorities may still maintain their social media

27   accounts that contain their true name, dates of birth and other personal information about

28

1  their home, work or social activities as well as photographs of themselves and their daily
2  activities.

3         11.    Based upon my training and experience, consultations with law enforcement
4  officers experienced in human smuggling investigations, and all the facts and opinions set
5  forth in this affidavit, I know that cellular/mobile telephones and SIM cards may and often
6  do contain electronic records, phone logs and contacts, voice and text communications,
7  and data such as emails, text messages, chats and chat logs from various third-party
8  applications, photographs, audio files, videos, and location data.  This information can be
9  stored within disks, memory cards, deleted data, remnant data, slack space, and temporary
10  or permanent files contained on or in the cellular/mobile telephones.

11                               **FACTS SUPPORTING PROBABLE CAUSE**

12         12.    During the week of September 10, 2019, approximately eight Haitians
13  representing themselves as father-minor son family units crossed into United States from
14  Mexico near the Tecate, California port of entry.  On further investigation, HSI Special
15  Agents (SAs) determined these four sets of family units did not consist of father-minor son
16  relationships and that these individuals were representing themselves as family units in
17  order to avoid detention and be released into the United States.  Some of these individuals
18  used false names in an attempt to represent themselves as minor children.  Four of those
19  eight individuals currently are being prosecuted for making false statements or presenting
20  false documents and one of those individuals is designated as a material witness.  *See*
21  *United States v. Guillaume*, 19MJ3964; *United States v. Monfort and Luma*, 19MJ3924;
22  *United States v. Estilus*, 19MJ3931 and *United States v. Joseph*, 19MJ3930 (material
23  witness complaint).  HSI SAs is examining phones seized in those cases and interviewing
24  other Haitian individuals claiming to be a part of family units to determine if there is a
25  particular group behind this smuggling venture.

26         13.    On September 30, 2019, at approximately 12:05 AM, Border Patrol Agents
27  apprehended two individuals without legal status who entered into the U.S.  The
28  apprehension occurred near the Tecate, California port of entry along the border between

1  Mexico and the United States. Upon apprehension, the two individuals were transferred to
2  the Brown Field Border Patrol Station in San Diego, CA for processing.

3        14.   The two individuals claimed to have a mother-minor daughter relationship:
4  Syloina MOISE as mother to a 10-year old minor, herein referred to as "WJ1". S. MOISE
5  claimed that she and WJ1 were citizens and nationals of Haiti. Neither of them possessed
6  the necessary documentation to enter or remain in the United States legally.

7        15.   On October 2, 2019, at approximately 12:10 AM, Border Patrol Agents
8  apprehended two individuals without legal status who entered into the U.S. The
9  apprehension occurred near the Tecate, California port of entry along the border between
10  Mexico and the United States. Upon apprehension, the two individuals were transferred to
11  the Brown Field Border Patrol Station in San Diego, CA for processing.

12        16.   The two individuals claimed to have a mother-minor daughter relationship:
13  Alize MOISE as mother to a 6-year old minor, herein referred to as "WJ2". A. MOISE
14  claimed that she and WJ2 were citizens and nationals of Haiti. Neither of them possessed
15  the necessary documentation to enter or remain in the United States legally.

16  **Syloina MOISE and WJ1:**

17        17.   On September 30, 2019, during initial processing, Syloina MOISE presented
18  a Haitian birth certificate identifying S. MOISE as WJ1's mother to Border Patrol Agents.
19  S. MOISE also verbally stated to Border Patrol Agents that she was WJ1's mother.
20  Furthermore, S. MOISE answered administrative immigration questions on WJ1's behalf
21  as her mother and accepted service of various immigration forms on WJ1's behalf as her
22  mother. As a result, Border Patrol Agents processed S. MOISE and WJ1 as a mother and
23  daughter family unit.

24        18.   On that same day, HSI SAs Richard Hinckley, Patrick Mackenzie, and I
25  conducted a post-Miranda interview with S. MOISE. S. MOISE stated she understood her
26  rights and was willing to speak with the SAs outside the presence of counsel. She also was
27  advised that she was speaking with federal agents and that it was a crime to lie to them. In
28

8

1  response to questioning, S. MOISE stated to agents that she was the biological mother of
2  WJ1. S. MOISE also presented a Haitian birth certificate identifying her as WJ1's mother.

3      19.      On that same day, HSI SAs seized **Target Device 1** from S. MOISE. S.
4  MOISE gave verbal and written consent to the search of **Target Device 1**. HSI SAs briefly
5  looked at images contained on **Target Device 1.** HSI SAs discovered an image of a Haitian
6  birth certificate indicating Alize MOISE as the mother of WJ1 and images of documents
7  showing that S. MOISE had traveled from Haiti with WJ1 and WJ2.

8      20.      On that same day, S. MOISE gave written consent to obtain Deoxyribonucleic
9  Acid ("DNA") saliva samples from S. MOISE and WJ1 in order to confirm their parent-
10 child biological relationship. HSI Special Agents took buccal swabs from S. MOISE and
11 WJ1 and submitted the swabs to a Rapid DNA test. The Rapid DNA results confirmed S.
12 MOISE and WJ1 did not have a parent-child biological relationship.

13     21.      HSIs SAs then re-interviewed S. MOISE. She was re-advised and her
14 Miranda rights and that making a false statement to federal agents was a crime. She again
15 agreed to speak with agents. HSI SAs confronted S. MOISE with the results of the Rapid
16 DNA test. She then admitted she was not the biological mother of WJ1. S. MOISE stated
17 WJ1 was, in fact, her niece and the biological daughter of S. MOISE's sister, Alize MOISE.
18 S. MOISE also admitted knowledge that the Haitian birth certificate she presented falsely
19 indicated that she was WJ1's mother.

20     22.      S. MOISE admitted that the fraudulent birth certificate was purchased in
21 Mexico, but she could not provide a firm timeline for when the document was created or
22 who specifically provided it to her. Furthermore, S. MOISE admitted that the sole purpose
23 of the fraudulent birth certificate was so it could be used to enter the United States.

24     23.      S. MOISE stated that Alize MOISE was currently in Tijuana, Mexico with her
25 other child, a 6-year old daughter (WJ2), and planned on entering the United States the
26 following day. S. MOISE stated "the Mexicans" told S. MOISE she should enter with the
27 older of the two daughters (WJ1) because the younger daughter (WJ2) might say something
28 to law enforcement that may reveal the truth about WJ1's identity.

9

24.    On October 1, 2019, a Complaint, charging MOISE with make false statements to a federal officer under 18 U.S.C. § 1001(a)(2) was filed in the U.S. District Court for the Southern District of California.  The Honorable Michael S. Berg signed the Complaint under Criminal Case Number 19MJ4250.

**Alize MOISE and WJ2:**

25.    On October 2, 2019, during initial processing, Alize MOISE stated to Border Patrol Agents that WJ2 was her daughter and Border Patrol Agents processed A. MOISE and WJ2 as a mother and daughter family unit.  Border Patrol Agents also reunited WJ1 and A. MOISE.

26.    On that same day, HSI SAs obtained written consent from A. MOISE to obtain Deoxyribonucleic Acid ("DNA") saliva samples from A. MOISE, WJ1, and WJ2 in order to confirm their parent-child biological relationship.  HSI SAs took buccal swabs from A. MOISE, WJ1, and WJ2 and submitted the swabs to a Rapid DNA test.  The Rapid DNA results confirmed A. MOISE was the biological mother of both WJ1 and WJ2.

27.    After the DNA saliva samples were taken, HSI SAs conducted a post-Miranda interview with A. MOISE.  A. MOISE stated she understood her rights and was willing to speak with the SAs outside the presence of counsel.  She also was advised that she was speaking with federal agents and that it was a crime to lie to them.  In response to questioning, A. MOISE stated to agents that she was the mother of both WJ1 and WJ2.  A. MOISE stated that she did not enter the U.S. with WJ1 because she had things to take care of prior to leaving Tijuana, Mexico and because WJ1 was familiar S. MOISE.  A. MOISE stated that S. MOISE had cared for WJ1 and WJ2 since 2015 when A. MOISE left Haiti.

28.    A. MOISE also stated that she had purchased the fraudulent birth certificate for WJ1 in Mexico from a Haitian man she knew as "Pierre" for 600 Mexican Pesos.  A. MOISE stated that she provided "Pierre" with biographical information of WJ1 and of WJ1's father in order to create the fraudulent birth certificate.  A. MOISE claimed to not have contact information for "Pierre" and that she had heard about "Pierre" from a friend named "Julie".  A. MOISE also claimed to not have contact information for "Julie".

1 | Shortly after, A. MOISE ceased the interview.  HSI SAs concluded the interview and
2 | returned A. MOISE to Border Patrol custody.

3 | 29.   On that same day, HSI SAs seized **Target Device 2** from A. MOISE for
4 | exigent circumstances given HSIs SAs believed A. MOISE used **Target Device 2** to
5 | coordinate the smuggling of S. MOISE and WJ1 through the use of the false birth record
6 | based on their training and experience that smuggled aliens coordinate with human
7 | smugglers over their digital devices, the interviews with A. MOISE and S. MOISE and
8 | based on their scan of **Target Device 1** that showed what appeared to be an image of the
9 | true birth record of MJ1. A. MOISE currently is being investigated but is not subject to
10 | prosecution at this time.  Per Border Patrol, A. MOISE likely will be released into the
11 | United States with her daughters while she is subject to immigration proceedings.

12 | 30.   Given the facts surrounding the apprehension of the individuals listed above,
13 | and based upon my experience and training, as well as consultation with other law
14 | enforcement officers experienced in human smuggling investigations, I submit that there
15 | is probable cause to believe that information relevant to the activities of S. MOISE, A.
16 | MOISE, WJ1, WJ2 and the co-conspirators, including the logistics of traveling from their
17 | country of origin through Mexico into the United States, the circumstances surrounding
18 | the producing and obtaining the false birth certificate, and correspondence between S.
19 | MOISE, A. MOISE and the co-conspirators about the use of minor children including WJ1
20 | will be found in the **Target Devices**.   Such evidence could be in the form of
21 | communications, records, data (including but not limited to emails, text messages, other
22 | social messaging applications), photographs, audio files, videos, or location data.

23 | 31.   I believe that the appropriate date range for the search of the **Target Devices**
24 | is:  from July 1, 2019 through October 2, 2019 for **Target Devices 1 and 2** given that
25 | images that were observed on **Target Device 1** indicated that S. MOISE would be traveling
26 | outside of Haiti with WJ1 and WJ2 on or about July 4, 2019 and that S. MOISE would
27 | likely coordinate with A. MOISE on their arrival in Mexico.  Furthermore, given A.
28 | MOISE was apprehended on October 2, 2019, I am requesting the end date of October 2,

1  2019 given A. MOISE would likely have tried communicate with S. MOISE after S.
2  MOISE tried to enter the U.S. on September 30, 2019.

3  **METHODOLOGY AS TO TARGET DEVICE 1 – THE CELL PHONE**

4      32.   It is not possible to determine, merely by knowing the cellular/mobile
5  telephone's make, model and/or serial number, the nature and types of services to which
6  the device is subscribed and the nature of the data stored on the device. Cellular/mobile
7  devices today can be simple cellular telephones and text message devices, can include
8  cameras, can serve as personal digital assistants and have functions such as calendars and
9  full address books and can be mini-computers allowing for electronic mail services, web
10  services and rudimentary word processing. An increasing number of cellular/mobile
11  service providers now allow for their subscribers to access their device over the internet
12  and remotely destroy all of the data contained on the device. For that reason, the device
13  may only be powered in a secure environment or, if possible, started in "flight mode" which
14  disables access to the network. Unlike typical computers, many cellular/mobile telephones
15  do not have hard drives or hard drive equivalents and store information in volatile memory
16  within the device or in memory cards inserted into the device. Current technology provides
17  some solutions for acquiring some of the data stored in some cellular/mobile telephone
18  models using forensic hardware and software. Even if some of the stored information on
19  the device may be acquired forensically, not all of the data subject to seizure may be so
20  acquired. For devices that are not subject to forensic data acquisition or that have
21  potentially relevant data stored that is not subject to such acquisition, the examiner must
22  inspect the device manually and record the process and the results using digital
23  photography. This process is time and labor intensive and may take weeks or longer.

24      33.   Following the issuance of this warrant, I will collect the subject
25  cellular/mobile telephones and subject them to analysis. All forensic analysis of the data
26  contained within the telephones and their memory cards will employ search protocols
27  directed exclusively to the identification and extraction of data within the scope of this
28  warrant.

34.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.   The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO TARGET DEVICE 2 – THE TABLET

35.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

**Forensic Imaging:**

a.     After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite.  A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.  The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added,

13

1  the length of time that the agents must remain onsite can become dangerous and
2  impractical.

3        b.    If it is not feasible to image the data on-site, computers and other electronic
4  storage devices, including any necessary peripheral devices, will be transported offsite
5  for imaging. After verified images have been obtained, the owner of the devices will be
6  notified and the original devices returned within forty-five (45) days of seizure absent
7  further application to this court.

8  **Identification and Extraction of Relevant Data:**

9        c.    After obtaining a forensic image, the data will be analyzed to identify and
10  extract data subject to seizure pursuant to this warrant. Analysis of the data following
11  the creation of the forensic image can be a highly technical process requiring specific
12  expertise, equipment and software. There are thousands of different hardware items and
13  software programs, and different versions of the same programs, that can be
14  commercially purchased, installed, and custom-configured on a user's computer
15  system. Computers are easily customized by their users. Even apparently identical
16  computers in an office or home environment can be different with respect to
17  configuration, including permissions and access rights, passwords, data storage, and
18  security. It is not unusual for a computer forensic examiner to have to obtain specialized
19  hardware or software, and train with it, in order to view and analyze imaged data.

20        d.    Analyzing the contents of a computer or other electronic storage device,
21  even without significant technical challenges, can be very challenging. Searching by
22  keywords, for example, often yields many thousands of hits, each of which must be
23  reviewed in its context by the examiner to determine whether the data is within the
24  scope of the warrant. Merely finding a relevant hit does not end the review process for
25  several reasons. The computer may have stored metadata and other information about
26  a relevant electronic record – e.g., who created it, when and how it was created or
27  downloaded or copied, when it was last accessed, when it was last modified, when it
28  was last printed, and when it was deleted. Keyword searches may also fail to discover

relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.    It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a

1 | particular user. For example, if an incriminating document is found on the computer
2 | but attribution is an issue, other documents or files created around that same time may
3 | provide circumstantial evidence of the identity of the user that created the incriminating
4 | document.

5 |      f.     Analyzing data has become increasingly time-consuming as the volume of
6 | data stored on a typical computer system and available storage devices has become
7 | mind-boggling. For example, a single megabyte of storage space is roughly equivalent
8 | of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000
9 | megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer
10 | hard drives are now being sold for personal computers capable of storing up to 2
11 | terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats
12 | or encrypted (several new commercially available operating systems provide for
13 | automatic encryption of data upon shutdown of the computer). The sheer volume of
14 | data also has extended the time that it takes to analyze data. Running keyword searches
15 | takes longer and results in more hits that must be individually examined for relevance.
16 | And, once reviewed, relevant data leads to new keywords and new avenues for
17 | identifying data subject to seizure pursuant to the warrant.

18 |      g.     Based on the foregoing, identifying and extracting data subject to seizure
19 | pursuant to this warrant may require a range of data analysis techniques, including
20 | hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude
21 | certain data from analysis, such as known operating system and application files. The
22 | identification and extraction process, accordingly, may take weeks or months. The
23 | personnel conducting the identification and extraction of data will complete the analysis
24 | within one-hundred twenty (120) days of this warrant, absent further application to this
25 | court.

26 |      h.     All forensic analysis of the imaged data will employ search protocols
27 | directed exclusively to the identification and extraction of data within the scope of this
28 | warrant.

**Genuine Risks of Destruction:**

i.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

**Prior Attempts to Obtain Data:**

j.     The United States via the HSI SAs conducted a cursory review of Target Device 2 as indicated in this affidavit but otherwise has not attempted to obtain this data by other means.

## CONCLUSION

36.     Based on all of the facts and circumstances described above, there is probable cause to conclude that S. MOISE and A. MOISE used the **Target Devices** to facilitate violations of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I) – Conspiracy to Bring Certain Aliens Without Presentation; 18 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. § 1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C. §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a Federal Investigation.

37.     Because the **Target Devices** were promptly seized during the investigation of S. MOISE and A. MOISE's false representation activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by S. MOISE and A. MOISE and others continues to exist on the **Target Devices**.

38.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

17

1    I swear the foregoing is true and correct to the best of my knowledge and belief.

2

3                                              Respectfully submitted,

4                                              _____

5

6                                              Special Agent Mauricio Duran
                                               Homeland Security Investigations

7

8    Subscribed and sworn to before me on October 3, 2019

9

10   _____

11   THE HONORABLE MICHAEL S. BERG
     UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

**Target Device 2**

           Samsung SM-T116BU
           IMEI: 359133/06/188693/9
           S/N: RQ2H800E9ZY
           Seized from Syloina MOISE on September 30, 2019

Currently in the possession of the United States Department of Homeland Security, Immigration & Customs Enforcement, Homeland Security Investigations, 2256 Niels Bohr Court, San Diego, CA 92154.

**ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the **Target Devices 1 and 2** – collectively, **the Target Devices** - includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below.  The seizure and search of the **Target Devices**, and will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data for the period from: July 1, 2019 through October 2, 2019 for **Target Devices 1 and 2:**

    a.    tending to identify the travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the travel from the country of origin through Mexico into the United States and then to the final destination within the United States; and, the smuggling method including the obtaining, making, altering, or using what appear to be official birth records from a foreign country to show a parent-minor child relationship in order to avoid detention or criminal prosecution in the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the travel from the country of origin through Mexico into the United States

21

1    and then to the final destination within the United States; and the smuggling
2    method including the obtaining, making, altering, or using what appear to be
3    official birth records from a foreign country to show a parent-minor child
4    relationship in order to avoid detention or criminal prosecution in the United
5    States;

6    d.   tending to identify travel to or presence at locations such as stash houses, ports
7         of call, launch bays, or delivery points involved in the travel from the country
8         of origin through Mexico into the United States and then to the final
9         destination within the United States; and the smuggling method including the
10        obtaining, making, altering, or using what appear to be official birth records
11        from a foreign country to show a parent-minor child relationship in order to
12        avoid detention or criminal prosecution in the United States;

13   e.   tending to identify the user of, or persons with control over or access to, the
14        subject telephones;

15   f.   tending to place in context, identify the creator or recipient of, or establish the
16        time of creation or receipt of communications, records, or data involved in the
17        activities described above;

18   g.   tending to identify method, and manner of payment for travel from the country
19        of origin through Mexico into the United States and then to the final
20        destination within the United States; and the smuggling method including the
21        obtaining, making, altering, or using what appear to be official birth records
22        from a foreign country to show a parent-minor child relationship in order to
23        avoid detention or criminal prosecution in the United States;

24   h.   tending to support or contradict the statements provided by Syloina MOISE
25        (S. MOISE) to Border Patrol Agents and Special Agents with Homeland
26        Security Investigations on September 30, 2019;

27

28

22

1    i.    tending to support or contradict the statements provided by Alize MOISE (A.

2          MOISE) to Border Patrol Agents and Special Agents with Homeland Security

3          Investigations on October 2, 2019;

4    j.    tending to provide the true names, aliases used, dates of birth, home, school,

5          and work addresses and information, and familial relationships for A. MOISE,

6          S. MOISE, WJ1 and WJ2;

7

8    which are evidence of crimes and property used in the commission of crimes of violations

9    of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I)  – Conspiracy to Bring Certain Aliens Without

10   Presentation; 18 U.S.C. § 371 – Conspiracy to Use False Documents; 18 U.S.C. §

11   1001(a)(2) – False Statements; 18 U.S.C. § 1001(a)(3) – False Documents; and 18 U.S.C.

12   §§ 1519 and 2 – Aiding and Abetting as to the Falsification of Records or Documents in a

13   Federal Investigation.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28